Argued January 10, reversed in part December 5, 1978, petition for rehearing denied January 9, 1979

FARRIS et al, *Respondents/Cross-appellants,*

*v.*

UNITED STATES FIDELITY AND GUARANTY COMPANY, *Appellant/Cross-respondent.*

(TC 28607, SC 25110)

587 P2d 1015

William E. Flinn, of Flinn, Lake & Brown, Eugene, argued the cause and filed briefs for appellant/cross-respondent.

Peter L. Barnhisel, of Fenner, Barnhisel & Morris, Corvallis, argued the cause and filed briefs for respondents/cross-appellants.

HOLMAN, J.

Lent, J., dissented and filed opinion in which Tongue, J., joined.

## HOLMAN, J.

This is an action for damages claimed to have resulted from defendant's denial of liability insurance coverage to its insureds. Defendant appeals from that part of the judgment for plaintifs entered on a jury verdict which awarded a recovery for emotional suffering and punitive damages. This case has previously been before this court, but no decision was there made which affects the issues presently in controversy. *See Farris v. U. S. Fidelity and Guaranty,* 273 Or 628, 542 P2d 1031 (1975).

Plaintiffs, who were partners in a sandwich shop, purchased from defendant a policy of general liability insurance for their business. They were subsequently sued by a business competitor which claimed that plaintiffs had harassed the competitor by engaging in unfair business practices. Plaintiffs tendered the defense of the case to defendant, which denied coverage. At the time of final rejection of coverage, defendant was aware that there was coverage but, nevertheless, chose to deny it. Its claims manager wrote: "* * * lets [sic] bluff it out we can always buy out at a later date."

After rejection, plaintiffs defended the action themselves and settled the matter prior to trial for $327. In the present case plaintiffs were awarded $2,535 for costs of defense and settlement, $5,000 each for emotional distress, and $10,000 punitive damages. The appeal is from the award for emotional distress and punitive damages only.

■ The first assignment of error raises the issue whether damages for emotional suffering may be awarded in a case of this kind. Plaintiffs testified they were upset and worried over the financial implications of the cost of defense and the payment of any judgment that might be secured against them. There is no doubt that defendant was guilty of a clear breach of its contract. Plaintiffs contend that defendant is guilty of a tort as well as a breach of contract because it

exercised "bad faith" in its decision to deny coverage and to refuse a defense. The generally accepted rule is that emotional distress caused by pecuniary loss resulting from breach of contract is not recoverable. The rule is embodied in Restatement of the Law of Contracts § 341:

> "In actions for breach of contract, damages will not be given as compensation for mental suffering, except where the breach was wanton or reckless *and caused bodily harm* and where it was the wanton or reckless breach of a contract to render a performance of such a character that the defendant had reason to know when the contract was made that the breach would cause mental suffering *for reasons other than mere pecuniary loss.*" (Emphasis added.)

*Accord,* McCormick, Damages § 81 at 286 (1935); V Corbin, Contracts § 1076 at 429 (1964 ed); 11 Williston on Contracts § 13.41 at 215 (1968). On the other hand, if the facts justify an action of tort, courts are inclined to allow recovery for emotional distress as part of the damages flowing from a tort cause of action. It therefore becomes important (according to the usual doctrine) whether plaintiffs' action for damages is one of contract or one of tort.

■ ORS 746.230, as part of the Insurance Code, enumerates unfair trade practices by insurance companies. It provides, in part:

> "(1) No insurer or other person shall commit or perform any of the following unfair claim settlement practices:
> "* * * * *.
> "(f) Not attempting, in good faith, to promptly and equitably settle claims in which liability has become reasonably clear.
> "* * * * *."

The above language does not make clear whether the legislature contemplates only claims filed against an insurance company by its insured, as in the case of

collision, fire or theft insurance, or whether it also contemplates the settlement of claims filed against its insureds by third parties, as in the case of liability insurance. However, the statute demonstrates that both types of claims are contemplated, as evidenced by the provisions of subsection (2) of the same statute, which states:

"No insurer shall refuse, without just cause, to pay or settle claims arising under coverages provided by its policies with such frequency as to indicate a general business practice in this state, which general business practice is evidenced by:

"* * * * *

"(b) A substantial increase in the number of lawsuits *filed against* the insurer or *its insureds* by claimants;
* * *

"* * * * *." (Emphasis added.)

The legislature has undertaken, by ORS 731.988, to provide civil penalties for violations of unfair trade practices:

"(1) *Any person who violates any provision of the Insurance Code,* any lawful rule or final order of the commissioner or any final judgment or decree made by any court upon application of the commissioner, *shall forfeit and pay to the General Fund of the State Treasury a civil penalty* in an amount determined by the commissioner of not more than $2,000 for each offense, or $10,000 in the aggregate for all such offenses within any three-month period. * * *.

"* * * * *.

"(2) *In addition* to the civil penalty set forth in subsection (1) of this section, *any person who violates any provision of the Insurance Code,* any lawful rule or final order of the commissioner or any final judgment or decree made by any court upon application of the commissioner, *may be required to forfeit and pay to the General Fund of the State Treasury a civil penalty* in an amount determined by the commissioner but not to exceed the amount by which such person profited in any transaction which violates any such provision, rule, order, judgment or decree.

[ 457 ]

"(3) Such civil penalty may be recovered in an action brought thereon in the name of the State of Oregon in any court of appropriate jurisdiction.

"* * * * *."[1] (Emphasis added.)

It is possible to contend that defendant's violation of the statute is a tort, and, therefore, plaintiffs are entitled to recovery for emotional distress as well as for their other damages. It is not our understanding that plaintiffs make this contention. It is evident from the statutes that it was the intention of the legislature to prohibit insurance companies from intentionally breaching their contract to settle their insureds' claims as defendant did here and to inflict certain consequences for so doing. However, such conclusion does not dispose of the question whether damages for emotional suffering were intended to be recoverable by an insured for such a breach. Because the statutes did provide for the payment of damages not usually recoverable in such a situation, it would appear that had the legislature intended to enlarge the damages further, it would have so provided. It was certainly not intended by the legislature that additional pressure to perform the contract be exerted by allowing the recovery of damages for emotional distress, since the statute provides for civil damages recoverable by the state for that purpose. There is nothing to indicate that the legislature intended, when it prohibited certain claims settlement practices in ORS 746.230, that actions for breach of insurance contracts would be transformed, in all of the covered instances, into tort actions with a resulting change in the measure of damages. The statutes express no public policy which would promote damages for emotional distress. Concern about the insured's peace of mind does not appear to be the gravamen of the statutory policy.

■ Plaintiffs do contend, however, that the common law of the construction of insurance contracts dictates

---

[1] "ORS 731.004 Short title. ORS chapters 731, 732, 733, 734, 735, 737, 743, 744, 746, 748, 750 and 751 may be cited as the Insurance Code."

that defendant was guilty of the kind of "bad faith" conduct which gives rise to tort liability and that damages for emotional distress are, therefore, recoverable along with plaintiffs' other damages.

The terms "good faith" and "bad faith" have been used by this court and other courts in connection with the duty of an insurer to settle cases within the policy limits when the prayer of the complaint against the insured is greater than the policy limits. It has been pointed out that in such situations conflicts of interest exist when there is a probability that any judgment returned against the insured will be greater than the policy limits. In such cases, the insurer has everything to gain and the insured has everything to lose by gambling on the possibility of a defendant's verdict. In such situations, because of the conflicts of interest, courts have held the insurer to a duty of "good faith" in investigating the facts and in attempting to settle within the policy limits. The exercise of good faith requires the insurance company to treat the matter as if there were no policy limits and as if any loss would be the sole responsibility of the insurer. *Eastham v. Oregon Auto Ins. Co.,* 273 Or 600, 607, 540 P2d 364 (1975); *Kuzmanich v. United Fire and Casualty,* 242 Or 529, 532, 410 P2d 812 (1966); *Radcliffe v. Franklin Nat. Ins. Co.,* 208 Or 1, 38, 298 P2d 1002 (1956). Plaintiffs use the language of these cases in asserting their right to damages, including those for emotional distress, arising out of a tort action for failure to exercise good faith in denying coverage.

This court has never decided whether a cause of action for failure to settle within the policy limits is one in contract or one in tort. *Radcliffe* quotes language which sounds as if it were in tort. See 208 Or at 39. However, in *Groce v. Fidelity General Insurance,* 252 Or 296, 306, 448 P2d 554 (1969), it is held that as a cause of action in contract, it is assignable by the insured.

Assuming, but not deciding, that a cause of action for failure to settle within the policy limits is one in

tort, it is our opinion that the rationale of such an action has no application to the present situation and that the present action is not one in tort. In an action for failure to settle within the policy limits, the insurance company is charged with acting in a fiduciary capacity as an attorney in fact representing the insured's interest in litigation. The company's interest comes into conflict with that of the insured's while representing him; and, arguably, acting in its own interests to the detriment of the insured's interest while acting in such a fiduciary capacity is a tort. In the present case, defendant did not undertake this fiduciary duty to represent the insured's interest in the litigation—it refused it. It did not, in the course of representing plaintiffs, violate its fiduciary duty arising out of sole control of the settlement. It never undertook any fiduciary duty by purporting to act in the interests of the insured.[2]

---

[2]The dissenting opinion states that "[s]ince there is no citation of authority for injecting the term 'fiduciary' into the majority's analysis, I assume it to be 'cut from the whole cloth.'" The dissent then cites three cases which it says stand for the proposition that the insurer is held to the duty imposed upon a "fiduciary" because of the *right* to control. Two of the cases are those of failure to settle within the policy limits in a situation in which the insurer has undertaken to exercise its contractual right to defend. In all three cases, the insurer was held to the duty of a "fiduciary." It is, therefore, difficult to see how the dissent arrives at the conclusion that "injecting the term 'fiduciary' into the majority's analysis" is "'cut from the whole cloth.'" The classification of an insurer as a "fiduciary" when deciding whether it should settle within the policy limits is so prevalent as not to require citation of authority.

The cases as mentioned above are cited for the proposition that the fiduciary duty comes from the right to control rather than from the exercise of that control. In one of the cases, *Gedeon v. State Farm Mutual Automobile Ins. Co.,* 410 Pa 55, 188 A2d 320, 322 (1963), the court points out that under the typical automobile policy the insurer contracts to perform three distinct obligations. The first is to indemnify against liability for damage caused by the insured to person and property. The opinion then proceeds to point out that the second duty is to defend, and says:

"* * * A refusal without good cause to defend breaches this obligation and gives rise to a cause of action regardless of the good faith of the insurer. See King v. Automobile Underwriters, Inc. [409 Pa 608], 187 A2d 584 (1962). *Based on the usual contract rule for determining damages, the recovery for breach of the covenant to defend will*

The distinction set forth above was noted in *Santilli v. State Farm,* 278 Or 53, 60-63, 562 P2d 965 (1977). It was, however, unnecessary to rule upon the question here posed because we held that the insurance company had just cause for contesting coverage. In *Santilli* we said:

"Plaintiff also contends that the trial court erred in sustaining defendant's demurrer to plaintiff's second cause of action. Plaintiff's second cause of action alleged that:

" 'II.

" 'The defendant's refusal to pay the proceeds due plaintiff under the life insurance policy issued to the insured was made in bad faith, was made intentionally, willfully and wantonly without a reasonable

---

*ordinarily be the cost of hiring substitute counsel and other costs of the defense.* This recovery may be in addition to any other obtained against the insurer.

"Thirdly, by asserting in the policy the right to handle all claims against the insured, including the right to make a binding settlement, the insurer assumes a fiduciary position towards the insured and becomes obligated to act in good faith and with due care in representing the interests of the insured. If the insurer is derelict in this duty, *as where it negligently investigates the claim or unreasonably refuses an offer of settlement,* it may be liable regardless of the limits of the policy for the entire amount of the judgment secured against the insured. See Cowden v. Aetna Casualty and Surety Company, 389 Pa 459, 134 A2d 223 (1957). Once again there can be a breach of this fiduciary duty without a breach of either the covenant to indemnify or the covenant to defend." (Emphasis added.)

In one of the other cases, *Cowden v. Aetna Casualty and Surety Company,* 389 Pa 459, 134 A2d 223, 228 (1957), the court said, quoting *Perkoski v. Wilson,* 371 Pa 553, 556, 92 A2d 189, 191:

"'* * * ' *When the company voluntarily undertook the defense of [the insured] in pursuance of its privilege under the policy,* it assumed a position of trust and confidence which called for an exercise of the utmost good faith, particularly in view of the possible conflict of interest between the insurer and the insured such as later developed.' * * *." (Emphasis added.)

Far from standing for the proposition that the fiduciary relationship arises from the right to control, if the cases indicate anything it is that, to the contrary, it arises from the exercise of the defense provided for under the policy and thus from entering upon a fiduciary relationship. To be fair, none of the cases should be cited for either proposition. The courts did not have before them the question which is in issue in the present case and the language, in any event, is equivocal.

[ 461 ]

investigation by defendant of the facts involved in the claim, and was a willful denial of the plaintiff's rights under the insurance contract.

" 'III

" 'As a result of defendant's conduct, the plaintiff has suffered mental distress and anguish to her general damage in the amount of ONE THOUSAND DOLLARS ($1,000.00), and plaintiff is entitled to punitive damages in the sum of TWENTY-FIVE THOUSAND DOLLARS ($25,000.00). * * *.'

"Plaintiff seeks to have this court recognize a cause of action for tortious breach of an insurer's duty of 'good faith and fair dealing' when dealing with its insured. This is a distinct tort which has recently emerged in California and has subsequently found favor in some other jurisdictions. *See Silberg v. California Life Ins. Co.,* 11 Cal 3d 452, 113 Cal Rptr 711, 521 P2d 1103 (1974); *Gruenberg v. Aetna Insurance Co.,* 9 Cal 3d 566, 108 Cal Rptr 480, 510 P2d 1032 (1973); *Fletcher v. Western National Life Ins.,* 10 Cal App 3d 376, 89 Cal Rptr 78, 47 ALR3d 286 (1970).

"This tort developed as an outgrowth of the cause of action for an insurer's bad faith refusal to settle within the coverage limits of a liability insurance policy. *See, e.g., Groce v. Fidelity General Insurance,* 252 Or 296, 448 P2d 554 (1969); *Radcliffe v. Franklin Nat'l Ins. Co.,* 208 Or 1, 298 P2d 1002 (1956). However, although the two situations are somewhat similar, there is a distinct difference between liability insurance and other types of policies which should not be overlooked.

"When an insured purchases liability insurance, he relinquishes his right to control any litigation brought against him for conduct which is covered under the policy, and he loses his right to negotiate a settlement with the opposing party. Moreover, when the settlement value of a case approaches the policy limits, it becomes increasingly more tempting for the insurer to gamble on the results of litigation, for in refusing to settle under such circumstances, the insurer stands to lose little and gain much. The insured, however, has a strong interest in settlement so as to avoid a judgment in excess of his coverage. Because of this conflict, courts have held insurers to a high duty of good faith and fair dealing

[ 462 ]

when conducting settlement negotiations on behalf of their insured.

"Such considerations are not applicable outside the field of liability insurance. In cases involving the insurer's duty to pay under policies for theft, fire, health, disability or life insurance, the unique relationship which gives rise to the special duty of liability insurers to attempt to settle within their policy limits does not arise. The insured, or his beneficiary, is not subject to the imposition of excess liability, and his rights and responsibilities are limited to those set forth in his contract." (Footnotes omitted.) 278 Or at 60-62.

While *Santilli* was an action upon a life insurance policy and the present action is upon a liability policy, the present action does not involve a failure to settle within the policy limits and the rationale expressed in *Santilli* is equally applicable. In a footnote to the above quotation we pointed out that some insurance companies have, at times, sought to settle with their insureds for significantly less than that to which they were entitled through deliberate patterns of harassment and delay. This is a case of neither harassment nor delay; it is a plain case of intentional breach of contract. The cases upon which plaintiffs rely and which are cited in the footnote in *Santilli* are primarily California cases. Some of them are cases like *Fletcher v. Western National Life Ins. Co.,* 10 Cal App 3d 376, 89 Cal Rptr 78, 47 ALR3d 286 (1970), in which the insurance company originally acknowledged responsibility under an accident policy and began to pay. It thereafter started an intentional program of harassment for the purpose of getting its insured in such an upset and emotional state of mind that he would readily settle the company's remaining liability. It is a typical case of outrageous conduct. However, some of the other cases, while dissimilar in some respects, are sufficiently similar to this case that they are not able to be distinguished. *Silberg v. California Life Insurance Co.,* 11 Cal3d 452, 113 Cal Rptr 711, 521 P2d 1103 (1974); *Gruenberg v. Aetna Insurance Company,* 9 Cal3d 566, 108 Cal Rptr 480, 510 P2d 1032 (1973).

The California courts have not, however, made the distinction pointed out here or in *Santilli* but have, without recognition that it was the fiduciary position of the insurer which arises when it represents the insured in litigation which gives rise to the good faith language, transposed the language into cases in which insurance companies have not undertaken representation of the insured at all. As a result, they have held an action in tort can lie for the breach of contract. In *Gruenberg, supra,* the California Supreme Court said:

> "* * * In those two cases, we considered the duty of the insurer to act in good faith and fairly in handling the claims of third persons against the insured, described as a 'duty to accept reasonable settlements'; in the case before us we consider the duty of an insurer to act in good faith and fairly in handling the claim of an insured, namely a duty not to withhold unreasonably payments due under a policy. These are merely two different aspects of the same duty. That responsibility is not the requirement mandated by the terms of the policy itself—to defend, settle, or pay. It is the obligation, deemed to be imposed by the law, under which the insurer must act fairly and in good faith in discharging its contractual responsibilities. Where in so doing, it fails to deal *fairly and in good faith* with its insured by refusing, without proper cause, to compensate its insured for a loss covered by the policy, such conduct may give rise to a cause of action in tort for breach of an implied covenant of good faith and fair dealing." 510 P2d at 1037.

The California court also said:

> "It is manifest that a common legal principle underlies all of the foregoing decisions; namely, that in every insurance contract there is an implied covenant of good faith and fair dealing. The duty to so act is imminent in the contract whether the company is attending to the claims of third persons against the insured or the claims of the insured itself. Accordingly, when the insurer unreasonably and in bad faith withholds payment of the claim of its insured, it is subject to liability in tort." 510 P2d at 1038.

Contrary to the California holdings, for the reasons given in *Santilli,* we believe defendant's failure to

undertake representation of plaintiffs which required them to represent themselves could only have been a breach of contract, and, in cases of breach, the law is clear that no recovery for mental distress because of threat of pecuniary loss is recoverable.[3]

■ Plaintiffs argue that one who enters into a contract of insurance does so to guarantee himself peace of mind in case an action or claim is made against him and, therefore, he should receive reimbursement for that for which he has bargained and not received. They cite language which so states from *Fletcher* and *Crisci v. Security Ins. Co.,* 66 Cal2d 425, 58 Cal Rptr 13, 426 P2d 173 (1967). The argument does not furnish a logical basis for recovery for emotional distress because many contracts for services, materials or financial assistance, as well as insurance contracts, are similarly made for economic and financial peace of mind. Every manufacturer who contracts in advance for materials which are necessary ingredients for his manufactured article does so for the same reason. Many contracts are made for the purpose of financial protection and assurance. If such a contractual purpose is all that is necessary to entitle one to a recovery for emotional distress resulting from breach of contract, the universal rule above set forth in the excerpt from Restatement of the Law of Contracts would not exist.

[3] It may logically be asked what difference it makes whether the action is considered one of contract or of tort. In a case like the present where plaintiffs received no injury or fright resulting in serious physical manifestations, why should it be of moment, when considering whether to allow recovery for the emotional distress, whether a plaintiff's concern about his financial plight arose out of a breach of contract or of a breach of contract which is also a tort? In reality, there probably isn't any reason for a distinction. Either people should be able to recover for their fear of financial disaster as the result of the other party's intentional breach of a contract or they should not. Calling an intentional breach of contract a tort has no magical consequences which change anything. Neither is there anything inherent in a contract of insurance which makes the suffering any greater, any less, or any more certain than in numerous other business contracts which are generally breached intentionally and for which no recovery for emotional distress is allowed.

■ Plaintiffs also contend, in effect, that the rule that a party who breaches a contract must pay only normal contract damages should not be applicable because the insurance business is tinged with a public interest similar to that of a public utility, and public policy dictates that full responsibility for the results of failure to perform should be imposed without respect to the rules applicable to other contracting parties. Plaintiffs point out no reasons why such public interest should change the measure of damages which has resulted in the rule against recovery for mental distress brought about by an intentional breach of a contract. Any idea of punishment or warning to others is within the province of punitive damages and has no place in consideration of the propriety of a recovery for emotional distress.

■ This brings us to defendant's other assignment of error, which is that the court should not have submitted the issue of punitive damages to the jury. The general rule is that there is no recovery of punitive damages for breach of contract. McCormick, Damages § 81 at 286 (1935) says:

> "For any kind of malicious or wanton and oppressive misconduct, actionable as a tort, exemplary damages may be given. Oppressive conduct by carriers and other public service enterprises is a frequent occasion for giving such damages. In actions, however, upon mere private contracts (except the action for breach of promise of marriage), *even where the breach is malicious and unjustified,* exemplary damages are not allowable." (Emphasis added.)

More specifically, McCormick says:

> "This enumeration of the classes of cases where punitive damages are recoverable has left untouched one important question, May such damages be recovered in actions for breach of contract? We have seen two types of situations where contracts often enter into the transaction upon which the cause of action is based, and where punitive damages are undoubtedly proper, first, the case where one by fraudulent representations has caused another to enter into a contract of purchase and to part

with value; second, where one has entered into a contract with a carrier or other public servant and the latter has wantonly breached its duty of service imposed by law. In the former case, the person defrauded may frequently have his choice between suing upon the purely tort basis of an action for fraud and deceit, or he may often sue in contract for breach of warranty, express or implied. If the former theory is chosen, exemplary damages may properly be claimed as in other tort cases where wrong motive is proven, and the fact that a contract was brought about by defendant's wrong is no reason for denying the usual punitive consequences for deliberate wrong.

"Similarly, as we have seen, the carrier or other public service enterprise who deliberately or wantonly breaches his public undertaking by refusing properly to serve a passenger, shipper, or patron is liable in tort for breach of the public undertaking, and exemplary damages may undoubtedly be assessed in such actions, notwithstanding the fact that the plaintiff could have elected to base his claim upon his contract with the defendant rather than upon the latter's public duty." (Footnotes omitted.) McCormick, Damages § 81 at 289-90 (1935).

It is within the province of legislative authority to decide whether an enterprise is of a public service character and the responsibilities and obligations attendant. The legislature recognized the public interest in the enforcement of insurance contracts and undertook to do something about it by enacting ORS 746.230 and 731.988 as part of the Insurance Code. In the absence of any common law civil penalties having been recognized for the conduct in question here, the legislature provided for penalties. In doing so, it did not provide for punitive damages. We, therefore, conclude that because it was writing on a clean slate, the legislature did not intend that punitive damages result because of the public service character of the relationship. It would, therefore, be inappropriate for this court to use further civil penalties for the accomplishments of the same purpose. In the case of *Roshak v. Leathers,* 277 Or 207, 560 P2d 275 (1977), a majority

of this court held that the existence of *criminal* sanctions is insufficient to prevent the imposition of punitive damages in civil proceedings for the same conduct. However, it was decided that by the enactment of ORS 161.045(3) the legislature demonstrated that it did not intend criminal sanctions to exclude the imposition of civil sanctions by way of punitive damages. The same conclusion cannot be reached here because the penalties provided by ORS 731.988 are specifically made "civil" penalties, thus demonstrating an intention to provide for the exclusive civil penalties to be imposed for the kind of conduct by an insurance company of which defendant was guilty in this instance.

That portion of the judgment for mental distress and punitive damages is reversed.

**LENT, J.,** dissenting.

In general, the majority's statement of the factual background is accurate, but in order to understand the extent of bad faith involved some amplification is necessary. The defendant, through its local counsel, notified plaintiffs' lawyer on March 28, 1973, that tender of the defense would not be accepted. No particulars were given other than the assertion that the policy did not provide coverage. The record discloses that neither defendant's nor counsel's files contain any notes or memoranda indicating how or why the initial decision to refuse to defend was made or even who made the decision. Correspondence continued between plaintiffs' lawyer and defendant's local counsel, in which plaintiffs' lawyer sought a more detailed reason for the rejection of the tender of defense. The agent through whom the insurance was written also urged the defendant to undertake the defense. Near the end of April defendant's local adjuster asked the defendant's home office to review the case to determine whether plaintiffs were entitled to a defense by defendant. By memorandum dated

May 2, 1973, and apparently received in Oregon on May 7, 1973, the home office in effect advised that defense with some reservation of rights be undertaken. Upon oral argument before this court, defendant's counsel conceded that the superintendent of claims in defendant's Portland office had knowledge of the memorandum about May 9, 1973. An amended complaint was filed against these plaintiffs approximately May 30, 1973, and defense upon the amended complaint was again tendered to defendant. The Eugene claims adjuster, by memorandum dated July 6, 1973, to the Portland superintendent advised the latter that defendant's local counsel believed defense should be undertaken by defendant. The superintendent received this memorandum on July 9, 1973, and wrote on it the following: "I do not disagree but lets [sic] bluff it out we can always buy out at a later date."[1]

Based upon this decision by the Portland superintendent, defendant refused to undertake the defense, which resulted in plaintiffs defending the action themselves with the consequences described in the majority opinion.

In the first paragraph of the majority opinion the following sentence appears: "This case has previously been before this court, but no decision was there made which affects the issues presently in controversy." I agree that the decision there was simply that the lower court erred in sustaining this defendant's demurrer to plaintiffs' complaint upon which the case at bar is pursued. The lower court had also stricken from the complaint plaintiffs' claim of damages for mental anguish and that ruling was assigned as error. In this respect we said in part:

"* * * Some jurisdictions, under evidence of aggravated circumstances, have allowed the insured in a liability policy to recover damages for mental anguish against the insurer. Cases collected in Annotation, 47

[1]Compare this quotation with that in the majority opinion.

[ 469 ]

ALR3d 314, 335-338 (1973). We conclude as a matter of policy that when there is an unaggravated breach, such as alleged in the complaint, damages are not awarded for mental anguish. *We do not decide what the result would be if there was evidence of an aggravated breach; that is, one, for example, made in bad faith or otherwise."* (emphasis added) 273 Or at 638.

It is obvious, therefore, that this court left open the possibility of recovery of damages for mental anguish where the insurer is guilty of an "aggravated breach" which was treated as being equivalent to a breach "made in bad faith." It is significant that this court recognized the possibility of recovery of damages for mental anguish for a bad faith refusal of the insurer to defend. The court was not there dealing with the case of an insurer's bad faith failure to settle within the policy limits. It is true the matter quoted is dictum, but it would be odd to suppose that it was set forth idly rather than as a signal.

The majority opinion moves on to a discussion of provisions of the Insurance Code. That discussion assumes that a request by the insured that the insurer defend in accordance with the policy is a "claim" as used in ORS 746.230 and quotes a part of that section:

"(1) No insurer or other person shall commit or perform any of the following unfair claim settlement practices:

"* * * * *

"(f) Not attempting, in good faith, to promptly and equitably settle claims in which liability has become reasonably clear;

"* * * * *"

I regard it to be at least somewhat questionable whether a request to defend is a "claim" as used in the section but will regard it as being so for this part of this opinion. It appears that certain other paragraphs of ORS 746.230(1) are arguably applicable:

"(a) Misrepresenting facts of policy provisions in settling claims;

"* * * * *

"(m) Failing to promptly provide the proper explanation of the basis relied on in the insurance policy in relation to the facts or applicable law for the denial of a claim."

I agree with the majority that these statutory provisions apply to claims arising out of liability insurance as well as collision, fire or theft insurance, but I don't see what difference that makes in the case at bar. This is not a case where the insurer is charged with committing unfair claim settlement practices with respect to a claim against its insured on a liability policy. Assuming, as we have, that this is a claim within the purview of the statute, this claim is directly by the insured against the insurer.

The majority concedes that it is "possible" to contend that "defendant's violation of the statute" is a tort. Since any contention by anyone is "possible," I assume the majority means that it is an arguable contention. I agree with the majority (given our assumption this is a "claim") that the defendant violated the statute. Again, however, I am troubled by the majority's desire to discuss the question posed, for they say:

"* * * It is not our understanding that plaintiffs make this contention [that violation of the statute is a tort].* * *"

If that is truly their understanding, I fail to see why they discuss it at all, let alone purport to *decide* that the statutory violation does not give rise to a private action by the injured claimant.

It is not clear to me whether plaintiffs do make the contention, for in this respect they say in their brief:

"ORS 746.230 is the legislature's expression of the type of insurance company practices which it considers unfair (some of which were obviously employed in this case). Our case is a good example of why a private legal action should be one of the remedies available to control bad faith and unfair practices of insurers. The insurance commissioner would simply not have the staff nor time

[ 471 ]

to investigate each denial of coverage or refusal to settle in the manner required to uncover evidence such as that presented in this case."

Arguably they do make the contention, and arguably the contention is a valid one.

The majority says that the legislature has imposed civil penalty liability in favor of the state for the statutory violation, and if it had intended enlargement of the liability to respond in damages in private litigation for mental anguish or emotional distress, it would have said so. Concludes the majority:

"* * * The statutes express no public policy which would promote damages for emotional distress. Concern about the insured's peace of mind does not appear to be the gravamen of the statutory policy."

The majority does not tell us what it believes to be the "gravamen" of the policy. It may well be that it was not "the insured's peace of mind." It is obvious that the legislature perceived certain insurance company conduct as being societally undesirable, made it illegal and provided for at least one form of sanction in the prescribed action by the insurance commissioner. Since disruption of the insured's peace of mind naturally and foreseeably follows upon such conduct, it may well be that one of the purposes of the legislature in decrying that conduct was to provide peace of mind to insureds in this state, and, if so, the private action for damages for disruption of that peace of mind is a valuable tool in forwarding the legislatively declared public policy.

Since the legislature did not expressly make the civil penalty the exclusive sanction for the proscribed conduct, what policy is advanced by the court in doing so? Why the tender concern for the wrongdoer? Because I am not sure the point of "tort per se" is at issue, however, I see no reason to discuss it further.

Following this initial discussion of the statutory implications (and leaving exclusivity of remedy for

later consideration), the majority turns to the issue of whether there is a common law tort, a contention surely made by the plaintiffs. After recognizing that the courts hold the insurer to a duty of "good faith" in investigating the facts and in attempting to settle liability claims within the policy limits, the majority says that the plaintiffs here seek to use the "language" of such cases to prevail. The majority then says that whether the recognized cause arises in contract or tort has not been decided by this court. *Radcliffe v. Franklin Nat. Ins. Co.,* 208 Or 1, 298 P2d 1002 (1956), is cited for indicating the cause is in tort. *Groce v. Fidelity General Insurance,* 252 Or 296, 448 P2d 554 (1969), is cited for the proposition that because the cause of action is in contract it is assignable. I do not read *Groce* exactly so to hold. In *Groce* the court said:

"* * * The right to expect one's insurer to exercise good faith in the settlement of claims is a valuable contract right. The insurer reserves absolute control over negotiation and litigation. The insurer owes a duty to exercise this control in good faith to protect the insured. See cases collected in the Annotation, 40 ALR2d 168 (1955). Even if the insurer's breach of its reciprocal obligation of good faith may be said for certain purposes to be tortious, *the cause of action arising from such breach is one that affects the insured in his property, as distinguished from his person,* and so ought to be as capable of assignment and survival as any other contract right * * *" (emphasis added) 252 Or 296, 302.

*Groce* mixes together two independent bases of assignability. Generally speaking, choses in action arising out of contract are assignable. Choses in action arising *ex delicto* from injury to one's property, as distinguished from one's person, are generally assignable.

"* * * Any claim which affects the estate of a party, although arising out of tort, may be assigned; but the rule is otherwise where it arises out of an injury to the person. An assignment of a mere litigious right is invalid; but an assignment of property is valid, although

that property may be incapable of being recovered without litigation. * * *" *Rorvik v. North Pac. Lumber Co.,* 99 Or 58, 91, 195 P 163 (1921).

*See also,* for general discussion, 6 Am Jur 2d, Assignments 218 et seq.

As noted in the majority opinion, *Radcliffe* indicates the cause is in tort. As early as 1954 Professor Robert E. Keeton stated, "Usually this duty is treated as one sounding in tort rather than contract." He cited cases from 10 jurisdictions as support for the quoted statement. Keeton, *Liability Insurance and Responsibility for Settlement,* 67 Harv LR 1136, 1138 n.5 (1954). The majority then assumes, without deciding, that the cause is one in tort. I would decide that it is.

The majority then finds that when the insurer has undertaken to defend the insured and in bad faith fails to settle within the policy limits, the insurer is liable to the insured for recovery in excess of the limits because the insurer "is charged with acting in a *fiduciary* capacity as an attorney in fact representing the insured's interest in litigation." (emphasis added) The majority then purports to distinguish the case at bar because the defendant, by refusing to undertake the defense, "did not undertake this fiduciary duty" and "never undertook any fiduciary duty." This distinction purports to rest upon some extensive dicta in *Santilli v. State Farm,* 278 Or 53, 562 P2d 965 (1977), and the rejection of the reasoning and results in certain cases from the jurisdiction of California.[2]

---

[2] Some of the California cases are concerned with harassment and delay by the insurer. The majority opinion concludes that we are not concerned here with a case of harassment or delay. It is difficult for me to understand, in light of defendant's conduct described in this and the majority opinion, what is the subject of our concern if it is not at least delay. Plaintiffs have been attempting to vindicate their rights under the policy from the spring of 1973 until now. I have little trouble, in light of the conduct of the defendant's Portland superintendent and the jury's resolution of the fact issues, in finding there has been harassment. I do not intend, however, to base this dissent upon the ground of harassment or delay except insofar as they are involved in denominating defendant's breach as being one made in bad faith.

The language quoted from *Santilli* does not mention the term "fiduciary" in the discussion of whether there should be different rules concerning the consequences of insurer bad faith in connection with liability policies, on the one hand, and life insurance policies on the other. Since there is no citation of authority for injecting the term "fiduciary" into the majority's analysis, I assume it to be "cut from the whole cloth."[3]

It is obvious that what the majority has done is simply to pin a label on the insurer to be used when the insurer has been guilty of one kind of bad faith breach of its contract and to deny application of the label in other kinds of bad faith breaches. By thus withholding the label the majority can then conclude that there is no breach of a duty imposed by law which will permit recovery of damages for mental anguish or emotional distress.

Before proceeding to analyze what the majority has hidden behind the label, I should like to point out that the Pennsylvania Supreme Court has had occasion to use the term "fiduciary" in connection with the insurer's obligations to the insured under a contract of liability insurance, but that court does not find that the insurer becomes a fiduciary only when it undertakes to perform under its contract. The Pennsylvania court finds the insurer is held to the duty imposed by law upon a fiduciary because of the insurer's *right* to control the litigation of claims against the insured, not because of the exercise of the right. In *Gray v. Nationwide Mutual Insurance Company,* 422 Pa 500, 223 A2d 8, 9 (1966), the court quotes with approval from *Cowden v. Aetna Casualty and Surety Company,* 389 Pa 459, 134 A2d 223 (1957):

"* * * [B]y asserting in the policy the right to handle all claims against the insured, including the right to

---

[3]I have no objection to arriving at conclusions or rules without citation of earlier authority. If the conclusion or rule be sound, the case expounding it may itself be cited for authority in later cases. I simply make the point that the majority's use of the term "fiduciary" is not found in *Santilli*.

make a binding settlement, the insurer assumes a fiduciary position towards the insured and becomes obligated to act in good faith and with due care in representing the interests of the insured. * * *" 223 A2d 9.

Similar language from *Gedeon v. State Farm Mutual Automobile Insurance Company,* 410 Pa 55, 188 A2d 320 (1963), is also quoted in *Gray.*

What is hidden behind the majority's use of the label is simply the conclusion by the majority that a bad faith breach by the insurer after undertaking performance of the contract is somehow different from a bad faith breach in refusing to perform at all. That distinction makes no sense to me. A breach of contract, perforce, is a failure to perform according to the terms of the contract. From the insured's standpoint, it can make little difference to him at what point in time his insurer in bad faith injures him and his property.

The discussion in *Santilli* did not seek to distinguish between kinds of breaches in liability contracts and did not rule that tort liability for an insurer's bad faith breach of a liability insurance contract is limited to the time of performance.

The "performance" of a liability insurance contract is not the only point in the relationship between the liability insurer and insured for which this court has indicated its concern. A line of decisions by this court has held that in case of any doubt about coverage the insurer has a *duty* to defend. In an earlier decision involving this same case, *Farris v. U.S. Fidelity & Guaranty,* 273 Or 628, 635, 542 P2d 1031 (1975), we quoted with approval from *Blohm v. Glens Falls Ins. Co.,* 231 Or 410, 416, 373 P2d 412 (1962): "Thus, if the complaint is ambiguous or unclear and may reasonably be interpreted to include an incident within the coverage of the policy, there is a duty to defend." In *Farris* we held that U.S. Fidelity & Guaranty had in fact a duty to defend the insureds. In *Casey v. NW*

*Security Ins. Co.,* 260 Or 485, 489, 490 P2d 208 (1971), we stated:

> "The difficulty arises when there is doubt as to coverage. This doubt sometimes cannot be resolved until a judgment is entered in litigation between the insured and the insurer. *This is too late;* the lawsuit by the injured party has been filed and probably gone to judgment before this time. The insurer has contracted with its insured to defend him. This benefit to the insured would be curtailed if it could be withheld in the event of a dispute about coverage. For this reason we have adopted the rule that in the absence of any compelling evidence of no coverage, the insurer owes a duty to defend if the injured claimant can recover under *the allegations of the complaint upon any basis for which* the insurer affords coverage." (emphasis added)

As the above cases indicate, a liability insurer owes a special obligation to an insured to defend him if there is any doubt about whether the insured is covered by the policy. It is "too late" to wait for a determination of the coverage issue. This special responsibility of the liability insurer arises because of the special relationship between it and the insured. As noted in *Casey,* at 489, "The insurer has contracted with its insured to defend him." In fact, the basis of liability insurance is not just the assumption of actual cost and losses that result from a lawsuit but also the assumption of the risk of being sued, of the selection of an attorney, of the responsibility and control of the litigation, and even of the risk of losing. It is because of this special responsibility and relationship arising from the contract, rather than any implied covenant of good faith in the insurance contract, that the law imposes a duty of good faith on the insurer and thus the bad faith breach of a liability insurance contract is a tort.

The above duty to defend cases did not involve tort liability for the refusal to defend. However, bad faith was not at issue in those cases. Here not only did the insurer have doubts about coverage, which this court has held imposes a duty to defend and an obligation to

pay for any costs and losses, but the insurer was also aware there was coverage and decided to bluff it out.

This is not just "a plain case of intentional breach of contract," as the majority characterizes the incident, but rather a blatant bad faith refusal to defend the insured. To bluff and, only if necessary, buy out later is in gross disregard of the insurer's responsibility to its insured. To deny tort liability for this bad faith because it did not occur during the performance of the contract amounts to a distinction without a difference to the insured. On the one hand the insurer prefers to go to trial rather than settle within the policy limits, resulting in the insured suffering a judgment in excess of the policy, and on the other hand the insurer refuses to defend at all, leaving the insured to pay for all costs and losses. In both cases the insured may have difficulty ascertaining whether the insurer is acting in good faith. If he believes he has been wronged, the insured is also forced to sue the insurer. Applying the majority's "performance" distinction, however, the insured in the first circumstance may seek a tort recovery in addition to contract damages, but in the second circumstance the insured is limited to recovery of the contract damages.

In fact, under the majority opinion in *this* case of bad faith refusal to perform the liability insurance contract, all the insurer has to lose is the costs and losses it would have borne anyway if it had accepted the case. If anything, a liability insurer intending to breach its contract in bad faith is encouraged to do so at the outset rather than risk the tort liability applicable to bad faith breaches *in performance.*

The majority opinion asserts that damages for emotional distress should not be recoverable here because contracts for services, materials or financial assistance are similarly made for economic and financial peace of mind. Further, the majority argues that the suffering is not any greater, any less, or any more certain than in the case of breach of other contracts;

however, as discussed above, part of the uniqueness of the relationship between the liability insurer and insured is that the insurer accepts the risk of being sued and dealing with a lawsuit. When an insurer refuses performance, he not only refuses to compensate a loss, if any, but also to assume the risk there may be a loss. That assumption of risk is the source of emotional distress being sued for here, not just the emotional distress of actually paying the settlement and attorney fees.[4]

It is simply unrealistic any longer to treat insurance policies as traditional private contracts. To do so ignores the real relationship between an insurer and small businessmen such as these plaintiffs. They do not have the bargaining power to obtain particular contract terms. A comprehensive liability policy such as is in evidence in this case is not a negotiated agreement. The matters of terms and premiums are almost completely uniform. It is only in the servicing of the agreement that insurers truly may be said to compete for the business of the ordinary purchaser of insurance. The policy of the kind here is largely a contract of adhesion. R. Keeton, Insurance Law § 6.3(a) (1971).

The majority refers to ORS 746.230(1)(f) and opines that the duty extends to third party claims. With this I agree. With the majority's further opinion, that the action by the Insurance Commissioner for civil penalties is the exclusive remedy,[5] I do not agree. The

---

[4] That insurers sell their product as being not only an agreement to indemnify the insured for certain kinds of loss but also to relieve the purchaser from anxiety concerning all aspects of claims is readily apparent in our society. One cannot watch nationally televised entertainment for very long without being exposed to commercials for the sale of insurance which, for example, indicate that the purchaser will be in "good hands," that he will have the assistance of a troop of mounted cavalry, that he has "a piece of the rock," or that "like a good neighbor" the insurer will be there. As such advertisements reflect, the relationship between insurer and insured does not merely concern indemnity for monetary loss.

[5] I find this is just another way of asserting legislative "preemption," which is a concept I thought the majority had abandoned before arriving at the final form of its opinion.

legislature, in proscribing insurer conduct involving bad faith has declared the public policy of this state. I believe this proscription has completely taken away from the insurer the "right" to breach its contract which is enjoyed by the ordinary businessman.[6] In this respect the majority indicates that many business contracts are made for the purpose of financial protection and assurance. The people have not yet declared intentional breaches of these ordinary business contracts to be against public policy except insofar as that conduct gives rise to a cause of action for damages. With respect to insurance, however, the statutory language places a duty to perform in the law rather than in the contract. I have already discussed that I find a common law duty to exercise good faith arising out of the relationship of insurer and insured. This duty is one imposed by law. It is not found in the contract. The contract only creates the relationship from which the law imposes the duty. It is certainly arguable that a cause of action arises from disobedience of the statute which also imposes such a duty to act in good faith arising out of the relationship which was created by the contract.

In summary, I believe these plaintiffs have a cause of action for damages for mental anguish for the insurer's breach of its duty to act in good faith. I find it in the common law, but it may well also exist by reason of the statute. I find, moreover, that there is nothing to indicate that the legislature intended the collection of civil penalties, ORS 731.988, by the Insurance Commissioner to be an exclusive remedy.[7] I

---

[6]Compare the language from the majority opinion:

"* * * It is evident from the statutes that it was the intention of the legislature to prohibit insurance companies from intentionally breaching their contract * * *"

[7]As a matter of fact the statute, ORS 731.988, which is *quoted in part* in the majority opinion provides in subsection (5) that the penalties are in addition to and not in lieu of other enforcement provisions contained in the Insurance Code. The Insurance Code provides for enforcement of certain provisions by private action and makes attorney fees recoverable in addition to damages as a part of the "big stick."

have discovered nothing in the legislative history to indicate that the legislature gave any thought whatsoever to exclusivity of remedy or, on the other hand, to creation of a private cause of action for violation of the statute.

The majority opinion impliedly assumes the continued vitality of the third party, excess recovery, common law action for bad faith by the insurer "in the performance" of the insurance contract. *See Radcliffe v. Franklin Nat. Ins. Co.,* 208 Or 1, 38, 298 P2d 1002 (1956), which had been on the books for several years prior to this legislation. Also, note the want of legislative activity following upon later cases, such as *Eastham v. Oregon Auto Ins. Co.,* 273 Or 600, 607, 540 P2d 364 (1975). If one can conclude that the legislature has made ORS 731.988 civil penalties the exclusive remedy with respect to bad faith remedies, how does one draw the line between those cases and the case at bar? Certainly there is no legislative history cited by the majority or in existence to indicate that the legislature intended to abolish private recovery in those cases. The obvious answer is that the legislature gave no thought to the question of the continued existence of the common law right of recovery in those cases, and neither did it give any consideration to whether other common law remedies might be fashioned to carry out the very policy which gave rise to the statutory injunction against insurer bad faith.

In addition to damages for mental anguish, punitive damages are also recoverable here. As this court held in *Butler v. United Pacific Ins. Co.,* 265 Or 473, 477, 509 P2d 1184 (1973), punitive damages are a penalty assessed for the purpose of deterring certain conduct. The conduct to be deterred here is a liability insurer refusing in bad faith to defend its insured, intending to "bluff it out."

Because of the disposition of this case by the majority, it has been unnecessary to consider certain claimed errors with respect to instructions on punitive

damages. Were my opinion to be adopted, resolution of that claim of error would be necessary, but there is nothing to be gained by my discussing it in this dissent.

I respectfully dissent.

Tongue, J., joins in this dissent.